IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Jacquelene Stewart | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-cv-1947 |
| | ) | |
| | ) | Judge: |
| Legal Assistant Foundation of | ) | |
| Metropolitan Chicago | ) | |
| Defendant. | ) | Magistrate Judge: |
| | ) | **JURY DEMAND** |

## COMPLAINT OF DISCRIMINATION

Now Comes Complainant, Jacquelene Stewart, by and through her attorneys, the Law Office of David E. Neely & Associates, and files this complaint of discrimination and states:

## INTRODUCTORY PARAGRAPH

This matter was initially filed with the EEOC in a timely manner on July 22, 2009 and on December 30, 2009, the U.S. Equal Opportunity Commission (EEOC) issued Plaintiff a right to sue letter. Plaintiff received the right to sue letter on January 3, 2010 but filed this action on or before March 30, 2010.
.

## JURISDICTION AND VENUE

This court has jurisdiction under Title I of Americans with Disabilities Act (ADA), 42 U.S.C.S. §§ 12111-12117, Civil Rights Act of 1964, as amended, 78 Stat. 253, as amended, 28 U.S.C., 1343 (a)(4) et seq., This Court has jurisdiction over such claims pursuant to 28 U.S.C. Sections 1331 and 1343(4). This Court has jurisdiction over related state claims under the doctrine of pendent jurisdiction pursuant to 28 U.S.C. 1367. Venue is proper in the Northern District of Illinois since the conduct and action complained of occurred in this district.

## THE PARTIES

1. Plaintiff, Jacquelene Stewart, is an African American female with a disability who resides in the City of Steger, Illinois, County of Cook which is in the Northern District of Illinois.;

2. Defendant Legal Assistant Foundation of Metropolitan Chicago is a not for profit organization. (Hereinafter referred to as the "Foundation" located in the City of Chicago, County of Cook which is in the Northern District of Illinois.

## PLAINTIFF IS A DISABLED PERSON WITHIN THE MEANING OF ADA

3. Stewart suffers from a disability called "Polymyositis" and is a disabled person within the meaning of the ADA. EEOC v. Lee's Log Cabin, Inc., 546 F.3d 438, 442 (7th Cir. 2008); Mobley, 531 F.3d at 545.

4. The ADA defines "disability" as:

   A. a physical or mental impairment that substantially limits one or more major life activities of such individual;

5. Plaintiff's impairment is physical which, substantially limits several major life activities such as walking, standing, lifting, bending, and the operation of a motor vehicle.

6. Plaintiff's medical history evidences a record of such impairment as articulated by Dr. Curry and Dr. Nayak.

7. Plaintiff was regarded as having such an impairment" and was subjected to actions prohibited under the ADA by her former employer because of such actual or perceived physical impairment.

8. Polymytosis constitutes a physical impairment that limits Plaintiff's ability to walk, stand or operate a motor vehicle.

9. Plaintiff is significantly restricted as to the condition, manner and duration under which she can walk, stand or operate a motor vehicle as compared to the condition, manner, or

duration under which the average person in the general population can perform that same major life activities See 29 C.F.R. § 1630.2(j)(1)(ii).

10. Polymyositis (pol-e-mi-o-SI-tis) is an uncommon connective tissue disease, a type of inflammatory myopathy, which is characterized by muscle inflammation and weakness, of which Plaintiff experienced.

11. The most noticeable characteristic of polymyositis which Plaintiff experienced is weakness of the skeletal muscles, which control movement such as walking, standing and driving.

12. Plaintiff's muscles closest to her trunk, such as her hips, thighs, shoulders, upper arms and neck was affected.

13. The weakness is symmetrical, affecting both the left and right sides of Plaintiff's body and gradually worsened after September 2007.

14. The muscle weakness started subtly and after it progressed over the course of the disease, it became difficult for Plaintiff to climb stairs, rise from her seated position, lift objects or reach over her head.

**EMPLOYER WAS AWARE OF PLAINTIFF'S DISABILITY**

15. On or about June 2007, Plaintiff informed her employer that she needed to have surgery and would be off work from 6-8 weeks.

16. The same day Plaintiff informed her employer that she would be off work for 6-8 weeks because of a required surgery, she was required to meet with her supervisor and the senior attorney to discuss a previous undisclosed performance review, which had never seen and was not prepared to discuss.

17. Plaintiff's disability is reoccurring and unrelated to her ability to perform her job duties with or without reasonable accommodations.

18. Plaintiff was not provided reasonable accommodations by her employer, but rather, was subjected to numerous "Plan(s) of Correction(s)" that increased her work load and need to drive, walk, climb stairs and stand.

19. On September 18, 2008, Plaintiff was discharge.

20. The employer's alleged non discriminatory reason for Plaintiff's discharge is that her performance reviews were unsatisfactory, although the employer failed to raise any performance issues with Plaintiff until after she notified her supervisor that she intended to take sick leave.

21. Plaintiff's requested sick leave was not without doctor's approval.

**WORK HISTORY**

22. Stewart is a certified Ombudsman with the State Of Illinois and a member of the United Legal Workers Union.

23. On or about October 2004, Stewart began working with the Legal Assistance Foundation as a volunteer Ombudsman.

24. On or about June 2005, Stewart was hired as a full-time Ombudsman and assigned to the South Suburban Neighborhood Office, an area including South Holland, which is closer to her home in Steger.

25. Stewart conducted approximately 200 investigations per year which required extensive walking, standing, climbing stairs and driving a motor vehicle.

26. From June 2005 through September 2008, Stewart's salary increased from $23,000.00 to $29,000.00 per year.

27. On or about February 2007, Kathy Swanson performed a surprised "ride along" performance review with Plaintiff, but did not notify Plaintiff of her recommendations and conclusions.

28. On or about June 2007, Plaintiff asked to meet with her supervisor for the purpose of requesting sick leave.

29. After Plaintiff requested sick leave in June 2007, Kathy Swanson revealed to Plaintiff the results of her February 2007 performance review.

30. Kathy Swanson is the Supervisor Attorney of the Ombudsman Project and her office is located in the Evanston Office.

31. Eugene Edwards is the Supervising Attorney for the South Holland neighborhood office.

32. Kathy Swanson advised Plaintiff that she was not happy with Plaintiff's performance evaluation and began question Plaintiff about a case that had been closed for months.

33. On or about June 2007, Stewart took leave from work to have surgery and was off work for six (6) weeks with sick pay.

34. Surgery was recommended by Plaintiff's physician.

35. Upon Plaintiff's return to work, she was written up on September 20, 2007, December 12, 2007 and June 16, 2008 and given "Plan(s) of Correction(s)" that increased her travel, walking, climbing, standing, driving a motor vehicle and paperwork.

36. On September 20, 2007 Plaintiff received a disciplinary notice and a plan of correction that increased her travel, walking, climbing, standing, driving a motor vehicle and paperwork.

37. The September 20, 2007 disciplinary notice included the time period Plaintiff was on sick leave.

38. On December 12, 2007, Plaintiff received a disciplinary notice involving a clerical error resulting in a delayed investigation.

39. Plaintiff received a disciplinary notice accusing her of falsifying travel expenses.

40. The employer did not maintain a project policy on documenting travel expenses for the project.

41. The employer imposed plans of corrections upon Plaintiff that increased her travel expenses.

42. On or about January 2008, Plaintiff's disability worsened.

43. On or about January 2008, Plaintiff's South Suburban Neighborhood Office was seriously flooded and every similarly situated co-worker of Plaintiff was given the option of working out of their home.

44. Plaintiff was not given the same accommodation as her non disabled co-workers.

45. On January 11, 2008, Stewart received an email from Kathy Swanson regarding Plaintiff's "temporary relocation to the Westside office".

46. Rather than providing Plaintiff with reasonable accommodations, the temporary location was very stressful because it increased Plaintiffs travel and associated activities and paperwork.

47. Even though Plaintiff was provided office space at the Westside, all of her resources that were not online, were still at her South Holland office.

48. Beverly Nunnally, Ombudsman/Paralegal, was given the option to work from her home in the south suburbs which gave her close access to the South Holland office which was about 10 minutes from her home.

49. Plaintiff was relocated to the Westside office, which is the fourth furthest office on the Westside of Chicago.

50. Even though Plaintiff's territory did not change, her travel time increased.

51. It was a common practice to be assigned a case and begin the onsite investigation the same day.

52. On January 22, 2008, Stewart suffered a relapse, experiencing polymyotisis symptoms which impacted her work by limiting her ability to stand or walk for extended periods of time.

53. Plaintiff lost muscle strength and the ability to drive an automobile.

54. On January 23, 2008, Plaintiff went on full time sick leave.

55. On January 26, 2008, Plaintiff received an email informing her that cases assigned to her were being reassigned to other staff members.

56. On April 7, 2008, Stewart returned to work on a restricted part time basis.
57. On April 8, 2008, Stewart was sent new project policies that became effective while she was out on full time sick leave.
58. On April 8, 2008, Stewart received an email from Kathy Swanson informing her that she was transferred to the Westside office and that her work would be shipped to her in boxes.
59. Being relocated to the Westside office of Chicago was not a reasonable accommodation, but a burden on Plaintiff.
60. On April 8, 2008, Stewart sent Swanson an email disagreeing with the "involuntary transfer" and requested a meeting before the proposed transfer date.
61. On April 24th, Stewart was sent an email outlining her new part time responsibilities starting April 28, 2008.
62. Plaintiff was assigned "intake" and worked with Kaitin Hannon until April 28, 2008.
63. The assignments imposed on Plaintiff created a burden for Plaintiff because she had to exert large amounts of energy locating boxes stored because of the flood, proofing manuals, manning the 800 intake line, opening cases, sending out literature because these duties imposed a heavier work load on Plaintiff and exceeded her normal duties.
64. On April 28, 2008, Plaintiff cases were reassigned back to her and she was instructed to begin quarterly visits to the facilities assigned to her.
65. Those facilities assigned to Plaintiff included Chicago Ridge, Concord, Dixie, Manor, Halsted Manor, Heather, Lexington, Chicago Ridge, Lydia, Midway, Plaza Terrace, and Rosary Hill.
66. Plaintiff was required to work with Kaitin on Mondays and work in the field on Tuesdays and Thursdays with resumption of full responsibilities required of her position.
67. The employer knew that Plaintiff's limited field assignment would adversely affect her investigations.
68. On June 16, 2008, Stewart received a letter outlining her unsatisfactory performance between September 2007 and June 2008 and warning her of the risk of discharge if her performance did not improve, even though Plaintiff believes she exceeded the plan of correction without reasonable accommodations.

69. On or about July 2008, Stewart returned to work full time.
70. Beverly Nunnally, a black female, is similarly situated with Plaintiff because they held the same position, same job responsibilities, had the same supervisors and both took sick leave.
71. Beverly Nunnally was given an opportunity to work out of her home, but Plaintiff was not.
72. Beverly Nunnally worked from home from January 2008 through March 2008.
73. Shelia Fernandez Jones, Vicky Michaels, and other of Plaintiff's similarly situated co-workers were allowed to work from their home on a permanent basis.
74. When Beverly Nunnully and Shelly Fernandez, did not submit their notes on time, they were not disciplined.
75. Both Beverly and Shelly reported to Kathy Swanson. Plaintiff is a disabled person within the meaning of 42 USCS § 12102
76. Plaintiff's impairments are not transitory or minor.
77. Even though Plaintiff's impairment is episodic or goes into remission, it is a disability because it substantially limits major life activity when active.
78. On September 18, 2008, Plaintiff was discharged.

## COUNT I.
## ADA DISCRIMINATION
### (Title I of Americans with Disabilities Act (ADA), 42 U.S.C.S. §§ 12111-12117)

79. Plaintiff realleges paragraphs 1 through 77 as paragraph 78 of Count I.
80. Defendant discriminated against Plaintiff as a qualified individual on the basis of disability in regard to her . . . terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).
81. Plaintiff has been subjected to actions prohibited under Title I of the Americans with Disabilities Act, 42 U.S.C. sec. 12111-17.
82. Defendant failed to accommodate Plaintiff's efforts to continue to work.
83. Even after Plaintiff was required to travel a longer distance to work, she was always on time.

84. Requiring Plaintiff to travel further outside her service area was physically demanding and both the treatment and the circumstances that gave rise to it were emotionally draining.
85. Defendant failed to consider and accommodate Plaintiff's disabilities in violation of Title I of the ADA which requires employers to consider and to accommodate disabilities. 42 U.S.C. sec.12112(b)(5)(A), (6) (defining failure to accommodate, and criteria with disparate impacts, as "discrimination").
86. Defendant's decision to reassign Plaintiff to a distant office, allow Plaintiff's co-workers to work from their home, and increase of Plaintiff's work load, travel time, walking, standing, and climbing stairs was irrational.
87. The disciplinary actions against Plaintiff were irrational actions.
88. Defendant could have complied with the ADA by providing Plaintiff with accommodation at any cost less than "undue hardship". 42 U.S.C. sec.12112(b) (5)(A), sec.12111(10).
89. Defendant's decisions were irrational distinctions based on disabilities.
90. The adverse decisions made against Plaintiff were not "job-related" for the position nor consistent with "business necessity". 42 U.S.C. sec.12112(b)(6).
91. In order for Plaintiff to recover under the ADA for an employer's failure to reasonably accommodate, she must first show: (1) that she was or is disabled as defined by the Act, (2) that his employer was aware of the disability, and (3) that she was qualified for the position in question. Best v. Shell Oil Co., 107 F.3d 544, 547-48 (7th Cir. 1997).
92. Plaintiff was qualified for the position in question because she physically performed the essential functions of her position, without accommodation, and she met the legitimate educational, training, experience, and other requirements set by the employer for the position.
93. Defendant's actions constitute willful violations of Title I of Americans with Disabilities Act (ADA), 42 U.S.C.S. §§ 12111-12117 and entitles Plaintiff to damages.

### DAMAGES AND RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant AT&T as to each count as follows:

a. Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

b. A judgment declaring that the practices complained of herein are unlawful and violative of Title I of Americans with Disabilities Act (ADA), 42 U.S.C.S. §§ 12111-12117;

c. An assignment of Plaintiff to the job she would now be occupying but for Defendant's discriminatory practices;

d. An adjustment of the wage rates, benefits, and seniority rights for Plaintiff to that level which Plaintiff would be enjoying but for Defendant's discriminatory practices;

e. Granting an order restraining Defendant from any retaliation against Plaintiff for participation in any form in this litigation;

f. All damages which Plaintiff have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation, commissions and job benefits she would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and anguish;

g. Front pay to Plaintiff until such time as she can be placed in the same position she would now have occupied but for Defendant's discriminatory practices;

h. Exemplary and punitive damages in an amount commensurate with Defendant's ability and so as to deter future conduct;

i. Awarding Plaintiff her costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

j. Pre-judgment and post-judgment interest, as provided by law; and

k. Granting Plaintiff such other and further relief as this Court finds necessary and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: March 26, 2010

s/David E. Neely<br>
David E. Neely & ASSOCIATES P.C.<br>
8401 So. Luella<br>
Chicago, Il. 60617<br>
(312) 315-8241<br>
deneely1@prodigy.net

## **VERIFICATION**

I, Jacquelene Stewart, hereby certify that I have read the allegations made by me in the complaint of discrimination and certify that the allegations are true and correct except for those matters made upon information and belief.

_____

**Jacquelene Stewart**
**Dated March 26, 2010**